## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| PARADYME MANAGEMENT, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 23-936 |
| THE UNITED STATES, | ) | Filed: August 21, 2023 |
| Defendant, | ) | Reissued: August 31, 2023* |
| and | ) | |
| VIDOORI, INC., | ) | |
| Defendant-Intervenor. | ) | |

## OPINION AND ORDER

Plaintiff, Paradyme Management, Inc. ("Paradyme"), filed this post-award bid protest challenging the U.S. Census Bureau's ("Census" or "USCB") decision to award a blanket purchase agreement to Defendant-Intervenor, Vidoori, Inc. ("Vidoori"), to provide Enterprise Testing services for Census' Applications Development Services Division ("ADSD"). Paradyme contends that the Court should invalidate Census' award because the agency failed to properly address Vidoori's impaired objectivity organizational conflict of interest ("OCI"). Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record. For the reasons discussed below, the Court **DENIES** Paradyme's Motion for Judgment and **GRANTS** the Government's and Vidoori's Cross-Motions.

---

* The Court issued this opinion under seal on August 21, 2023, and directed the parties to file any proposed redactions by August 28, 2023. Only the Government requested redactions. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 22). Redacted material in the body of the opinion is represented by bracketed ellipses "[. . .]."

# I.   BACKGROUND

## A.   The Solicitation

Census issued Request for Quote No. 1333LB-22-Q-0000-0500 ("Solicitation") on November 8, 2021, seeking quotations for the award of a single award blanket purchase agreement ("BPA") for application testing services to support Census' Testing Center of Excellent ("TCoE"), which "provides centralized support for enterprise level testing throughout the USCB." AR 1144; *see* AR 300–01, 307. Census subsequently amended the Solicitation three times. AR 699, 825, 1111. Under the BPA, Census intends to issue call orders when certain work is needed under the following five functional task areas: (1) Task Area 0001: Review and Modernize the Testing Center of Excellence; (2) Task Area 0002: Testing Support Services; (3) Task Area 0003: Program and Project Management; (4) Task Area 0004: Consulting Services; and (5) Task Area 0005: Governance Support and Maintenance of the Testing Center of Excellence. AR 1185.

## B.   The Quotations

Following a preliminary evaluation, four contractors—Paradyme, Vidoori, [. . .], and [. . .]—submitted quotations in response to the Solicitation. AR 1414, 1498, 1583, 1672. In its quote, Vidoori identified a "minor risk of OCI." AR 1656. Vidoori noted that it had developed a testing tool, Vidoori Performance Test Tool ("VPT"), that it has licensed to Census "for the purpose of conducting performance and scalability testing on USCB systems and software." AR 1656. The quote explained that "[c]onsequently, it is possible Vidoori will be tasked with evaluating VPT and/or other performance test tools as part of the 'consulting services' required under Task Area 0004." *Id.*

To address the potential OCI, Vidoori proposed a mitigation plan. AR 1657. Specifically, Vidoori proposed that, "[s]hould a call order be issued under the BPA that requires evaluation of

testing tools, either offered by Vidoori or [its] competitors, Vidoori will recuse [itself] from the evaluation and assign the task to one of [its] subcontract partners." *Id.* Vidoori also stated it would "continue to monitor for any additional risks of OCI." *Id.*

On May 10, 2022, Census determined that Vidoori's quote provided the best value for the Government and awarded the BPA to Vidoori. AR 2054. In his evaluation, the Contracting Officer ("CO") recognized the minor risk of a potential OCI and noted Vidoori's mitigation plan. AR 2052–53.

## C.     Government Accountability Office Protest and Revised Mitigation Plan

On May 26, 2022, Paradyme filed a protest with the Government Accountability Office ("GAO"), and on June 13, 2022, it filed a supplemental protest. AR 2306, 2344. Among other things, Paradyme argued that Vidoori had an impaired objectivity OCI, as the Solicitation would require Vidoori to evaluate its own test tool—VPT—and would provide Vidoori the opportunity to make recommendations regarding VPT to Census. AR 2352. In response to the protest, Census decided to take corrective action by reevaluating quotations and issuing a new award decision. AR 2366. As part of the corrective action, Census requested that Vidoori submit a revised mitigation plan. AR 2379. Census found that, despite Vidoori's original plan, "there still appears to be a potential conflict of interest since the prime (Vidoori) and its proposed subcontractors would have a financial relationship that could impact the objectivity of the subcontractor when evaluating a product owned by the prime." *Id.*

Vidoori responded to the request with a revised mitigation plan. AR 2389. Citing to GAO precedent, it began by explaining that the use of firewalled subcontractors is "the most common method for neutralizing impaired objectivity OCI's that involve the evaluation of one's own company or product." AR 2388. Under the revised plan, Vidoori stated that it would "assign all

work relating to the evaluation of test tools to Concept Solutions, LLC or Bart & Associates, LLC, which are both subcontractors listed in Vidoori's proposal."  AR 2389.  Vidoori selected these subcontractors in part because they do not own or license test tools that could be evaluated under the Solicitation.  *Id.*  Furthermore, Vidoori stated it would impose a strict firewall between Vidoori personnel and its subcontractors when performing work related to the evaluation of test tools.  AR 2390.  Among several other details describing the implementation of the firewall, Vidoori explained that its General Counsel would be responsible for monitoring the firewall and would also "meet regularly with Vidoori's managers responsible for BPA performance to ensure that all OCIs or potential OCIs are timely identified and mitigated."  *Id.*  Finally, Vidoori stated that it intended "to remove VPT and any Vidoori-owned products from contention for evaluation (unless otherwise directed by USCB) if a Task Order is issued requesting evaluation of products that could encompass VPT or any Vidoori-owned tools."  AR 2391.  It concluded that "[t]his extra measure, combined with the firewall procedures, should fully insure the USCB against an impaired objectivity conflict."  *Id.*

After Vidoori submitted the revised mitigation plan, the CO, with the assistance of a Technical Evaluation Team ("TET"), reevaluated quotes and conducted an updated OCI analysis for all quotes, which the CO documented in a memorandum dated May 24, 2023.  AR 5388.  The CO concluded that Vidoori's revised mitigation plan was acceptable to the Government.  AR 5397.  He noted that GAO precedent approves the use of firewalled subcontractors to mitigate impaired objectivity OCIs and that, separate from the instant procurement, another Census department (the ADSB's Enterprise Development Tools Support Branch ("EDTSB")) is responsible for selecting software for use by the agency.  *Id.*  The CO also noted Vidoori's other mitigation strategy to remove VPT from future consideration for license renewal, at Census' discretion.  *Id.*

Accordingly, the CO found Vidoori's "mitigation strategy would completely avoid impaired objectivity." *Id.* Having concluded that Vidoori effectively mitigated all OCI concerns, on May 24, 2023, Census again awarded the BPA to Vidoori. AR 5412.

**D.    The Present Protest**

On June 21, 2023, Paradyme filed its Complaint alleging that Vidoori had unmitigated impaired objectivity, biased ground rules, and unequal access to information OCIs; that Census unreasonably and unequally evaluated Paradyme's and Vidoori's quotes; and that Census conducted a flawed best value tradeoff. *See* Pl.'s Compl. ¶¶ 76, 132, 160, 164, 172, ECF No. 1. On July 7, 2023, Paradyme filed its Motion for Judgment on the Administrative Record, which is limited solely to the claim that Vidoori's quote suffered from an unmitigated impaired objectivity OCI. *See* Pl.'s Mot. for J. on Admin. R. at 6–7, ECF No. 33. Paradyme seeks an injunction prohibiting Census from awarding the BPA to Vidoori and requiring Census to reevaluate Vidoori's OCI and make a new award determination. *Id.* at 34–35. On July 17, 2023, the Government and Vidoori filed Cross-Motions for Judgment on the Administrative Record arguing Census reasonably concluded that Vidoori's revised mitigation plan adequately addressed any impaired objectivity OCIs. *See* Def.'s Mot. for J. on Admin. R. at 8–9, ECF No. 35; Def.-Intervenor's Mot. for J. on Admin. R. at 13, ECF No. 34. The Motions are now fully briefed and ripe for decision. *See* Pl.'s Resp. in Support of Mot. for J. on Admin. R., ECF No. 36; Def.'s Resp. in Support of Cross-Mot. for J. on Admin R., ECF No. 38; Def.-Intervenor's Resp. in Support of Cross-Mot. for J. on Admin R., ECF No. 37. The Court held oral argument on August 4, 2023.

## II.   LEGAL STANDARDS

### A.   Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside if either:

(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error."  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and internal quotation marks omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities."  *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive."  *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

**C.     Impaired Objectivity Organizational Conflicts of Interest**

An impaired objectivity OCI may arise when a contractor is tasked with "evaluat[ing] its own offers for products or services, or those of a competitor."  Federal Acquisition Regulation ("FAR") 9.505-3.  "The primary concern under this type of OCI is that a firm might not be able to render 'impartial advice' due to its relationship with the entity being evaluated." *Turner Constr. Co., Inc. v. United States*, 94 Fed. Cl. 561, 569 (2010) (quoting *In re Aetna Gov't Health Plans, Inc., Found. Health Fed. Servs., Inc.*, No. B-254397, 1995 WL 449806, at *9 (Comp. Gen. July 27, 1995)), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).  "In order to show an 'impaired objectivity' OCI, there must be hard facts showing that 'a government contractor's work under one government contract could entail it evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals.'" *Sigmatech, Inc. v. United States*, 144 Fed. Cl. 159, 181 (2019) (internal quotation marks omitted) (quoting *Aegis Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016)).

An agency shall not award a contract to an offeror with an impaired objectivity OCI "without proper safeguards to ensure objectivity to protect the Government's interests."  FAR 9.505-3.  The FAR instructs that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract."  FAR 9.505.  Accordingly, the Federal Circuit has held that "the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009) (citing FAR 9.505).  The Court thus evaluates an agency's determination that an offeror's mitigation plan sufficiently remedied an OCI under an arbitrary and capricious standard.  *Id.*

# III.  DISCUSSION

Paradyme challenges Census' award of the BPA to Vidoori on three grounds: (1) that Vidoori's revised mitigation plan is too narrow in scope; (2) that the CO did not adequately review Vidoori's revised plan; and (3) that the CO failed to comply with certain FAR provisions including those related to "significant" OCIs.  The Court concludes that Paradyme's protest is unavailing on all three grounds.  The CO rationally concluded that Vidoori's revised mitigation plan sufficiently addresses any OCI concerns.  Additionally, his review and analysis was adequate and did not violate the FAR, and in particular the requirements raised by Paradyme regarding significant OCIs.

## A.    The CO Rationally Concluded that Vidoori's Revised Mitigation Plan Sufficiently Addresses Any OCI Concerns.

Upon reviewing Vidoori's revised mitigation plan, the CO concluded "that OCI concerns with . . . Vidoori, have been acceptably mitigated and pose[] no impact on the award."  AR 5398. Paradyme disagrees with this conclusion, arguing that Vidoori's revised mitigation plan is too limited in scope.  ECF No. 33 at 15.  Specifically, Paradyme reads the mitigation plan to use firewalled subcontractors only when OCIs arise under Task Area 0004 of the Solicitation.  *Id.* at 16.  Paradyme contends, however, that OCIs could arise under several Task Areas.  *Id.* at 17.

Although the CO made no explicit finding regarding whether the use of firewalled subcontractors is a mitigation strategy limited to Task Area 0004, his OCI analysis does not indicate that he interpreted the strategy as being limited in that way.[1]  AR 5394, 5397.  Moreover, the CO's conclusion that the revised mitigation plan sufficiently addresses any OCIs was not

---

[1] Vidoori contends that it did not limit the revised mitigation plan to Task Area 0004, and the Government likewise contends that the plan is not so limited.  ECF No. 34 at 22 ("While Vidoori's mitigation plan mentioned Task Area 004 several times, the mitigation plan made it clear that 'all work relating to the evaluation of test tools' will be performed by a firewalled subcontractor and did not limit this to work to any specific Task Area."); *see* ECF No. 35 at 18.

arbitrary or capricious.  First, Vidoori's firewalled subcontractor strategy encompasses all Task Areas, not just Task Area 0004.  It is true that in its analysis of the impaired objectivity OCI risk, Vidoori concluded that potential OCIs are limited to Task Area 0004.  AR 2389 ("The potentially conflicted work is confined to a small portion of Task Area 0004 – Consulting Services.").  Vidoori's actual mitigation plan, however, is not so limited, as Vidoori assured that it "plans to assign *all work relating to the evaluation of test tools* to Concept Solutions, LLC or Bart & Associates, LLC . . . ."  *Id.* (emphasis added).  The only time Vidoori mentioned Task Area 0004 in describing the details of its revised mitigation plan was when it affirmed that its subcontractors do not own test tools that could be evaluated under that Task Area.  *Id.*  While this statement implicitly recognizes that Task Area 0004 presents the most likely instance of an OCI risk, it in no way unequivocally limits the mitigation strategy itself.  Thus, even if Vidoori believed that potential OCIs would be limited to Task Area 0004, because Vidoori planned to assign "all work relating to the evaluation of test tools" to firewalled subcontractors, its revised mitigation strategy encompasses all Task Areas.  *Id.*

Second, even if Vidoori's firewalled subcontractor strategy is limited to Task Area 0004, its alternative mitigation strategy would sufficiently mitigate any OCIs that arose in other Task Areas.  Vidoori's revised mitigation plan stated, "[i]n addition to the Firewall provisions described above, Vidoori intends to remove VPT and any Vidoori-owned products from contention for evaluation (unless otherwise directed by USCB) if a Task Order is issued requesting evaluation of products that could encompass VPT or any Vidoori-owned tools."  AR 2391.  By giving Census the power to fully eliminate Vidoori-owned products from review under the BPA, any impaired objectivity OCI concerns would be fully resolved.  The CO's conclusion that Vidoori's alternative

mitigation strategy "would completely avoid impaired objectivity" was thus completely rational. AR 5397.

Paradyme argues that, despite Vidoori's alternative strategy, the revised mitigation plan is still insufficient because it only addresses situations where Vidoori would be tasked with evaluating its own products.  ECF No. 33 at 17.  Paradyme argues that under the BPA, Vidoori may also be tasked with recommending test tools to Census, and Vidoori's interest in recommending its own products could create an impaired objectivity OCI in such situations.  *Id.*  Paradyme contends that since neither of Vidoori's mitigation strategies address instances where Vidoori is tasked with recommending products, the revised mitigation plan is insufficient.  *Id.*

To support this argument, Paradyme points to several provisions in the Solicitation that it argues could task Vidoori with recommending test tools to Census.  It identifies Task Area 0001, under which the "contractor shall review the existing TCoE processes, procedures, standards, and policies then provide feedback and implement approved modernizations for the TCoE."  *Id* (quoting AR 1185).  It points to Task Area 0005, which requires "ensuring industry best practices, modernization of standards and testing tools and all TCoE policies and procedures."  *Id.* at 17–18 (quoting AR 1190).  This Task Area also requires the contractor to "[a]nnually, at a minimum, research application testing industry best practices and new testing tools/technology then present research and any recommended updates for the TCoE to the TCoE Governance Board for approval."  *Id.* at 18 (quoting AR 1190).  Paradyme further notes that the Solicitation required offerors to describe "an approach to the recurring review and modernization of policies, procedures, documentation and standards, ensuring that the TCoE is adhering and capitalizing on industry best practices as well as new and emerging technologies."  *Id.* (quoting AR 1271 (Master

BPA Factor 2 – Technical Approach, Subfactor 2C – TCoE Technical Approach)).   The Solicitation also required an approach for "leveraging new technologies." *Id.* (quoting AR 1271).

As further support, Paradyme argues that Vidoori suggested in its quote that it plans to recommend products to Census, which also creates OCI concerns. *Id.* at 21.  Paradyme points to Vidoori's proposal to hold monthly meetings with the TCoE Governance Board to discuss "industry innovations, emerging technologies, and relevant tool/software demonstrations." *Id.* (quoting AR 1623).  It notes that Vidoori touted its own internal Test Innovation Lab, stating the lab "continuously researches new technology and processes" to discover "novel approaches, efficiencies, applications of technology, and other innovations" and Vidoori will "share these with the TCoE to ensure alignment with best practices." *Id.* at 22 (quoting AR 1627).  And it identifies Vidoori's "plan[] to support the EDTSB in their efforts to identify and integrate tools that are to be utilized by the TCoE." *Id.* (quoting AR 1655).

None of these examples undermine the CO's acceptance of Vidoori's revised mitigation plan because none of these solicitation provisions nor portions of Vidoori's quote raised OCI concerns unaddressed by the revised mitigation plan.   While the Solicitation required the contractor to stay abreast of "new testing tools," AR 1190, and "new and emerging technologies," AR 1271, and although Vidoori stated in its quote that it would research "new technology and processes," AR 1627, these responsibilities would not implicate VPT.  VPT "is an existing, rather than 'new tool,'" AR 2389, that Vidoori has already licensed to Census three times, AR 5401. Vidoori owns no other test tools that it markets, nor does it plan on developing any.  AR 2391. Vidoori does own a Synthetic Data Generation Tool, but that tool is used to generate data, not test software, and it is simply a product Vidoori uses to support its software testing functions, not a product Vidoori markets to other entities.  AR 1629, 2391.  Thus, even if Vidoori was tasked with

recommending new test tools to Census, it does not own a tool that would create an impaired objectivity OCI in such a scenario.

Furthermore, the likelihood that Vidoori would be tasked under the BPA with recommending new test tools at all is undercut by the existence of a separate contract for just such activity.  As the CO recognized, the software selection process is conducted by another Census department, in conjunction with Paradyme, through a separate contract.  AR 5397 ("The software selection process is the responsibility of the USCB EDTSB and ETSB [Enterprise Testing Support Branch] provides support for that effort when requested."); AR 5391 (recognizing a distinct contract in place "to review and select software products"); *see* AR 3843 (contract with Paradyme to, in part, support the EDTSB by "[e]stablishing an enterprise tools selection criteria").  The purpose of the BPA, in contrast, is "to conduct application testing."  AR 1183.  The differing purposes of these contracts, recognized by the CO in his OCI analysis, decreases the likelihood that Vidoori would be tasked with recommending test tools and reveals the merely speculative nature of Plaintiff's arguments.

The GAO cases relied upon by Paradyme are also inapposite.  Paradyme cites to *In re Alion Science & Technology Corp.*, where the GAO sustained a protest due to an agency's failure to sufficiently address several OCIs.  No. B-297022.3, 2006 WL 59564, at *8 (Comp. Gen. Jan. 9, 2006).  In *Alion*, the board found the agency disregarded several OCIs evident from the successful bidder's proposal, even when they were identified by the successful bidder itself.  *Id.* at *5, 7. Here, however, the CO fully recognized Vidoori's OCI and rationally concluded it could be mitigated through Vidoori's revised mitigation plan.  One of the OCI concerns recognized in *Alion* also parallels the concern raised by Paradyme—that the contractor would be placed in a position to recommend its own products to the Government or steer the Government away from its

competitors' products.  *Id.* at *7.  But the successful bidder in *Alion* "manufacture[d] and market[ed] multiple . . . products to the U.S. government, foreign government[s], and commercial customers worldwide" that could create an OCI under the procurement at issue, *id.*, whereas, Vidoori owns only one test tool (that is not new) that it could theoretically recommend to Census under the BPA, AR 2389.  And as Defendant-Intervenor correctly notes, after the agency in *Alion* reanalyzed the OCI at issue, the board denied a subsequent protest and found that the agency reasonably considered and accepted the successful bidder's plan to use firewalled subcontractors as a mitigation strategy.  *In re Alion Sci. & Tech. Corp.*, No. B-297022.4, 2006 WL 2820168, at *7 (Comp. Gen. Sept. 26, 2006).

Paradyme also relies on *In re Leidos, Inc.*, where the GAO found an agency reasonably concluded that a subcontractor's mitigation plan insufficiently addressed the identified OCIs.  No. B-417994, 2019 WL 7019036, at *9–10 (Comp. Gen. Dec. 17, 2019).  But the board found this conclusion to be rational because, unlike firewalls between a prime contractor and subcontractor, which it held are effective in mitigating OCIs, the subcontractor's firewall would be between employees within the same organization.  *Id.*  *Leidos* thus endorses the viability of Vidoori's mitigation plan.  In *Leidos*, the board also found the agency reasonably concluded that the subcontractor's plan to recuse itself when an OCI arose was insufficient because the subcontractor lacked the authority to recuse itself under the contract and because of the need for the subcontractor's participation in all facets of contract work.  *Id.*  Here, there is no claim that Vidoori lacks recusal authority and no hard facts supporting the contention that having Vidoori's subcontractors perform the work subject to the firewall strategy would render the contract unworkable.  Accordingly, neither *Alion* nor *Leidos* supports Paradyme's attack on the sufficiency of Vidoori's mitigation plan.

In sum, Paradyme's assertion that the Solicitation and Vidoori's quote raise OCI concerns grounded in a task to recommend test tools relies on unconvincing speculation, not any "hard facts" that are required to demonstrate the existence of an OCI. *Sigmatech*, 144 Fed. Cl. at 181. The only potential impaired objectivity OCI raised by the Solicitation and grounded in hard facts is the risk that Vidoori would evaluate VPT. For the reasons explained, it was rational for the CO to conclude that Vidoori's revised mitigation plan sufficiently addressed that OCI.

**B.    The CO Adequately Considered Vidoori's Revised Mitigation Plan.**

Paradyme next argues that the CO did not sufficiently review and analyze Vidoori's revised mitigation plan. ECF No. 33 at 25–26. Paradyme argues that "in the GAO cases Vidoori cited in its mitigation plan, the agency in each case documented significantly more detailed analysis of the OCI and the impact of the offeror's mitigation plan." *Id.* at 26. Specifically, Paradyme contends that the CO failed to address the following issues: whether the firewalled subcontractor strategy was adequate; whether Vidoori had proper procedures to identify conflicted work; the impact of Vidoori recusing itself from evaluation of test tools and the significance of that work; and the impact of potentially making VPT unavailable to Census. *Id.* at 27–29.

First, the CO did address the suitability of the firewalled subcontractor strategy, noting that "preceden[t] exists from other GAO engagements utilizing this firewalling approach within the Federal Government." AR 5397. Vidoori first identified these cases in the revised mitigation plan in response to the CO's concerns about the original plan. AR 2388–89. As one of those cases explains, the GAO "has determined in a number of protests that the use of firewalled subcontractors can adequately mitigate impaired objectivity OCIs." *In re Soc. Impact, Inc.*, B-412941, 2016 WL 4120089, at *7 (Comp. Gen. July 8, 2016) (collecting cases). Judges of this court have likewise accepted firewalled subcontractors as an adequate solution. *Alion Sci. & Tech.*

*Corp. v. United States*, 74 Fed. Cl. 372, 376 (2006); *see Turner Constr.*, 94 Fed. Cl. at 570.  The CO also noted that "[t]he revised OCI Mitigation Plan included [descriptions of] how this firewalling would be managed within the Vendor team and be communicated with the Government."  AR 5394.  A review of the revised mitigation plan demonstrates that Vidoori provided a detailed description (that was not provided in its original plan) of how it would implement the firewall, including commitments to forego all communication between Vidoori and subcontractor personnel regarding firewalled tasks, provide subcontractor personnel with training materials regarding the firewall, limit access to documentation related to the evaluation of test tools to only the subcontractors, and ensure subcontractors report directly to Census regarding their work.  AR 2390.  Vidoori also included in the revised plan the identity of the firewalled subcontractors it would use and guaranteed that they do not own or license software tools that could be evaluated under the BPA, which ensured they have no conflicts.  AR 2389.

That the CO may not have considered or at least did not document his consideration of the other issues Paradyme raises is unavailing.  Paradyme is correct that certain GAO cases have approvingly noted a CO's detailed review of a contractor's OCI risks and mitigation plan.  *See, e.g.*, *In re Alion Sci. & Tech. Corp.*, 2006 WL 2820168, at *5 (finding an agency's OCI analysis to be "thorough and complete"); *In re Bus. Consulting Assocs.*, LLC, No. B-299758.2, 2007 WL 2264682, at *7 (Comp. Gen. Aug. 1, 2007) (finding significant that "the agency conducted extensive discussions with each offeror about the potential OCIs and the details of each offeror's proposed mitigation plan"); *In re Soc. Impact, Inc.*, 2016 WL 4120089, at *4–7 (analyzing CO's thorough review of mitigation plan).  None of these cases, however, considered such thorough documentation to be the minimum or "floor" required of every agency when reviewing OCIs and mitigation strategies.  Rather, the FAR states that "[i]n fulfilling their responsibilities for

identifying and resolving potential conflicts, contracting officers should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation." FAR 9.504(d).

At bottom, Paradyme merely disagrees with the scope of the CO's considerations and the level of detail the CO provided in his analysis. But unless his determination was arbitrary and capricious, which it was not, "mere disagreement [with the breadth of the CO's the investigation] is not sufficient for the court to conclude the investigation was insufficient." *Koam Eng'g Sys., Inc. v. United States*, 164 Fed. Cl. 128, 168 (2022). Indeed, as the Federal Circuit has explained, the CO's evaluation of Vidoori's mitigation plan was a fact-specific, considerably discretionary inquiry. *Axiom Res. Mgmt.*, 564 F.3d at 1381–82. The CO's documented analysis demonstrated a complete understanding of Vidoori's mitigation plan and found it "fully mitigates the Government's OCI concerns." AR 5394; *see* AR 5397–98. Having found that conclusion to be rational, and respecting the significant discretion given to the CO as well as the FAR's guidance to avoid unnecessary delay and documentation, the Court concludes that the CO's review and analysis of Vidoori's revised mitigation plan was sufficient.

## C.   Paradyme Has Not Shown that Census Violated the FAR.

Finally, Paradyme argues that "the contracting officer did not comport with the requirements in FAR 9.504(a) and 9.506(b) concerning 'significant' OCIs." ECF No. 33 at 29. Specifically, Paradyme alleges that the CO failed to assess whether Vidoori's potential OCI was significant, *id.*, and to "'submit for approval to the chief of the contracting office' a 'written analysis, including a recommended course of action for avoiding, neutralizing, or mitigating the conflict,'" as required by FAR 9.506(b), *id.* at 30 (quoting FAR 9.506(b)).

FAR 9.506(b) places the following requirements on the CO:

      (b) If the contracting officer decides that a particular acquisition involves a significant potential organizational conflict of interest, the contracting officer shall, before issuing the solicitation, submit for approval to the chief of the contracting office (unless a higher level official is designated by the agency)—

           (1) A written analysis, including a recommended course of action for avoiding, neutralizing, or mitigating the conflict, based on the general rules in 9.505 or on another basis not expressly stated in that section;

           (2) A draft solicitation provision (see 9.507–1); and

           (3) If appropriate, a proposed contract clause (see 9.507–2)[.]

FAR 9.506(b).    Under this rule, a "written analysis" and the "approval of the chief of the contracting office" are necessary only "*[i]f* the contracting officer decides that a particular acquisition involves a *significant* potential organizational conflict of interest." *Id.* (emphasis added). "Thus, the contracting officer is not required to document in writing or submit for approval a plan to neutralize apparent or potential conflicts, which in her discretion and judgment are deemed not to be significant." *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010).

      The CO concluded that Vidoori has only a potential OCI; and although his memorandum did not include an explicit "significance" analysis, he expressly noted the minor nature of the OCI. *See* AR 5389 ("Vidoori[] did make note of a *potential minor risk* of OCI given that Vidoori develops tools to enhance their test support capabilities. . . . Therefore, any potential Enterprise Testing Support Services OCI needs to be analyzed and fully addressed.") (emphasis added)); AR 5394 (noting that Vidoori "highlighted that [the] '*potentially conflicted work represents a very small percentage of the total work*' (Page 2) under the Solicitation" (emphasis in original)); *see DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1314–15 (Fed. Cir. 2021) (holding that the Court could discern the agency's decisional basis from the record even if the analysis was not expressly designated as such). Likewise, the TET never found that Vidoori's potential OCI is significant; in fact, it found the opposite. AR 5382 ("[T]he TET concluded that [Vidoori's] potential OCI is minimal."). Contrary to Paradyme's assertion, the CO accordingly had no

obligation under FAR 9.506(b) to submit to the chief of the contracting office a written analysis regarding the mitigation of Vidoori's potential impaired objectivity OCI.  *See PAI*, 614 F.3d at 1353.  And while FAR 9.504(a) urges timeliness in identifying, evaluating, and mitigating OCIs, that provision does not independently require any written analysis or up-the-chain approval.  FAR 9.504(a); *see Turner Constr.*, 645 F.3d at 1386.

As with other aspects of the OCI analysis, the CO has "considerable discretion in determining whether a conflict is significant."  *PAI*, 614 F.3d at 1352; *see Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 378 (2004) ("A CO's determination regarding whether the acquisition involves a significant conflict will be overturned only on a showing of unreasonableness.").  Consistent with the discussion above, Paradyme has not shown with hard facts (as opposed to speculation) that Vidoori has some far-reaching impaired objectivity OCI.  Citing the decision in *Filtration*, Paradyme merely argues that Vidoori's potential OCI is significant because Census required Vidoori to submit two mitigation plans.  ECF No. 36 at 17.  While the court in *Filitration* faulted the agency for failing to recognize the significant OCI in that case, it in no way concluded that the submission of two mitigation plans was dispositive.  *See* 60 Fed. Cl. at 378.  Rather, the court found the contracting officer should have been aware of the bidder's significant OCI before contract award based on discussions with the bidder and agency personnel who "informed her that they recognized the potential for a conflict of interest," while the submission of the mitigation plans merely "buttressed" their conclusions.  *Id.*  Here, Vidoori's mitigation plans were submitted to address a potential OCI that neither Vidoori, the TET, nor the CO recognized as significant, and the mere fact that Vidoori was asked to revise its mitigation plan does not in and of itself signify that the potential OCI addressed by the plan is significant.

Additionally, Paradyme has not shown that Census failed to heed the FAR's directive to identify, evaluate, and mitigate potential OCIs at the earliest stage possible in the procurement. As part of the acquisition planning process, before publication of the Solicitation, Census considered "[p]otential or actual conflicts of interest and any plans for mitigation thereof."   AR 292.   The Formal Acquisition Plan was approved by Molly Shea, Census' Senior Procurement Official and Chief Acquisition Officer.   AR 295.   Census included the applicable and required Commerce Acquisition Clauses regarding OCIs in both the Solicitation and final awarded contract. AR 1249–50, 5474–77.   Census expressly noted in the Solicitation that "[t]here is a potential organizational conflict of interest . . . due to vendors currently under contract . . . with the USCB to support Enterprise Testing[,]" AR 1249, and accordingly required offerors to "provide the [CO] with complete information regarding previous or ongoing work that is in any way associated with the contemplated acquisition[,]" AR 1250.   Paradyme does not contend that these actions failed to comply with the FAR.   ECF No. 36 at 18.

Paradyme also acknowledges that the CO became aware of Vidoori's potential OCI when Vidoori submitted its quote in response to the already-issued Solicitation.   ECF No. 33 at 29 (citing AR Tab 45B (Vidoori Technical OCI Mitigation Plan)).   Upon review, Census evaluated Vidoori's potential OCI and original mitigation plan before making an award determination, as evidenced by the TET evaluation and the CO's best value determination.   AR 1944, 2020, 2024, 2052–53. Following the GAO protest, Census took corrective action, including requesting and evaluating Vidoori's revised mitigation plan, as well as preparing a memorandum documenting its OCI analysis for each contractor.   AR 5388.   The CO rationally concluded that Vidoori's "OCI concerns" were "acceptably mitigated" by its revised plan "and pose[d] no impact on the award." AR 5398; *see* FAR 9.504(e) ("The contracting officer shall award the contract to the apparent

successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated."). Under these circumstances, the Court cannot conclude that Census failed to fulfill its duties under FAR 9.504(a). *See Turner Constr.*, 645 F.3d at 1386.

Accordingly, Paradyme has not met its burden of demonstrating that Census' award decision was not in accordance with law.

**D.    No Injunctive Relief Is Warranted Because Paradyme Fails on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because Paradyme has not succeeded on the merits of its protest, no injunctive relief is warranted in this case. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## IV.    CONCLUSION

For the reasons set forth above, the Court **DENIES** Paradyme's Motion for Judgment on the Administrative Record (ECF No. 33), **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 35), and **GRANTS** Vidoori's Cross-Motion for Judgment on the Administrative Record (ECF No. 34). The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after August 30, 2023, unless the parties submit **by no later than August 28, 2023**, an objection specifically identifying the protected information subject to redaction. Any objecting party must submit a proposed redacted

version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED**.

Dated: August 21, 2023                                    /s/ Kathryn C. Davis
                                                         KATHRYN C. DAVIS
                                                         Judge